# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DAVID ROBERT BENTZ,     )
                              )
           Plaintiff,     )
                              )
vs.                     )     Case No. 3:14-CV-996-NJR-DGW
                              )
KIMBERLY BUTLER, AIMEE LANG,     )
BILL WESTFALL, JAMES BEST,     )
FRANK EOVALDI,     )
MICHAEL SAMUELS,     )
NICHOLAS BEBOUT, CLINT MAYER,     )
JOSHUA BERNER, SHANE QUANDT,     )
DONALD LINDENBERG,     )
JARED PHILLIPS, JAY MCMILLAN,     )
and WESTLEY SPILLER,     )
                              )
          Defendants.     )

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Currently pending before the Court is the Motion for Summary Judgment filed by all Defendants, except Westley Spiller, on January 11, 2017 (Doc. 113).[1] For the reasons set forth below, the Motion is granted in part and denied as moot in part.

## INTRODUCTION

On September 12, 2014, David Robert Bentz, along with five other inmates, filed a purported class action complaint on behalf of themselves and other inmates incarcerated at the Menard Correctional Center alleging they were subjected to unconstitutional conditions of confinement because of excessive heat in the North-2 cellhouse ("N-2")

---

[1] Bentz was granted leave to amend his complaint and add Westley Spiller as a Defendant on April 10, 2017, which was after the motion for summary judgment had already been filed (Doc. 133).

during the summers (Doc. 1). That complaint was dismissed without prejudice on October 16, 2014, for failure to state a claim (Doc. 15). After Plaintiffs filed an amended complaint on November 6, 2014 (Doc. 18), they were issued a warning about the perils of proceeding jointly and directed to notify the Court if they still wished to proceed with the suit (Doc. 22). Only two Plaintiffs, Bentz and Jesse Perez, adopted the amended complaint (Docs. 31, 35). Perez, however, later sought and was granted leave to dismiss his claims (Docs. 61, 67). As such, Bentz is the only remaining Plaintiff.

In a nutshell, the amended complaint alleges that prison officials at Menard, individually and in conspiracy with one another, do not take adequate measures to ensure the health and safety of Bentz and the members of the proposed class when temperatures in N-2 rise above a heat index of 90 degrees (Docs. 18, 36). According to the amended complaint, there are few or no fans circulating air through the unit as a whole (*Id.*). Ice and water are not regularly available in sufficient quantities and intervals (*Id.*). Routine wellness checks are not made during these periods (*Id.*). Bentz alleges the high heat and humidity is not merely uncomfortable, it poses a scientifically recognized health risk, and an even greater danger to those with certain preexisting health conditions (*Id.*).

The amended complaint was screened pursuant to 28 U.S.C. § 1915A, and Bentz was permitted to proceed on three counts:

> **Count 1:** Since the summer of 2014 (in an ongoing violation), Defendants, individually and/or in conspiracy, by their acts and their failure to cure the conditions of confinement, endangered inmates' health and safety whenever the heat index exceeded 90 degrees, in violation of the Eighth

Amendment;

**Count 2:**    Since the summer of 2014 (in an ongoing violation), Defendants, individually and/or in conspiracy, by their acts and their failure to cure the conditions of confinement, negligently endangered inmates' health and safety whenever the heat index exceeded 90 degrees, in violation of Illinois common law; and

**Count 3:**    Since the summer of 2014 (in an ongoing violation), Defendants, individually and/or in conspiracy, have by their acts and their failure to cure the conditions of confinement, retaliated against Bentz in violation of the First Amendment.

(Doc. 36).

To the extent that Counts 1 and 2 are pursuing claims on behalf of a class, those claims are dismissed because, to date, no motion for class certification under Federal Rule of Civil Procedure 23 has been filed. Consequently, the Court construes Counts 1, 2, and of course 3, as pertaining to Bentz only.

The fourteen current Defendants were all employed at Menard during the relevant time period as either correctional officers or medical staff, except for Kimberly Butler, who is the former Warden of Menard. Each of the Defendants, except for Butler, worked in or around N-2, which houses both general population inmates and those subject to segregation.

In their motion for summary judgment, Defendants argue that they are entitled to judgment as a matter of law because they did not subject Bentz to unconstitutional conditions of confinement, they did not violate his Eighth Amendment rights, they did not retaliate against him, and they are otherwise entitled to qualified immunity (Doc. 114). Bentz filed a response in opposition to the motion for summary judgment on

March 31, 2017 (Doc. 128). One week later, he filed an amended response, to which he attached an affidavit that purports to verify that both the amended complaint and the response itself are "true and correct" (Doc. 131, p. 13). Defendants filed a reply to Bentz's response on April 24, 2017 (Doc. 138).

<u>LEGAL STANDARD</u>

"Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing FED. R. CIV. P. 56(a)). In determining whether a genuine issue of material fact exists, the Court views the record in the light most favorable to the nonmoving party, and construes all facts and draws all reasonable inferences in favor of that party. *Bunn*, 753 F.3d at 681.

On a motion for summary judgment where the nonmovant bears the ultimate burden of proof on a claim, the moving party still has the "initial burden of production . . . to inform the district court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The movant can satisfy their burden by either "presenting affirmative evidence that negates an essential element of the nonmoving party's claim" or by simply "showing that there is an absence of evidence to support the nonmoving party's case." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016); *Modrowski*, 712 F.3d at 1169.

If the movant takes the latter approach, the non-moving party "must respond by offering evidence that would allow a reasonable trier of fact to find in that party's favor

on the issue." *Hummel*, 817 F.3d at 1016 (citation omitted). "The non-moving party 'need not depose her own witnesses or produce evidence in a form that would be admissible at trial, but she must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file)." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Here, Bentz states in his response and affidavit that he "will produce evidence of retaliation [and other things] with testimony of witnesses and/or previous Plaintiffs in this action and other" (Doc. 131, p. 13). Such a response to a Rule 56 motion is insufficient. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). Bentz cannot merely inform the Court that certain individuals will provide testimony *at trial* to support his case. He is "required to marshal and present the court with the evidence [he] contends will prove his case" *right now*, as part of his response to summary judgment. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *See also Parker v. Trustees of Indiana University School of Medicine*, 800 F.3d 843, 848 (7th Cir. 2015) ("Federal Rule of Civil Procedure 56 demands that the non-movant 'cite to *particular parts* of materials in the record' in order to show that there is a genuine dispute of fact between the parties . . . ." (quoting FED. R. CIV. P. 56(c)(1)(A)). To the extent that Bentz has not presented any evidence to dispute Defendants' statement of undisputed material facts, those material facts, as long as they are supported by

evidence, shall be accepted as true.

Bentz's affidavit also leaves a lot to be desired. In this brief affidavit, Bentz essentially states that every fact contained in the amended complaint (Doc. 18), and his response (Doc. 131), are true and accurate. This assertion presents a problem with respect to the amended complaint because that document was signed by six Plaintiffs, including Bentz. Bentz does not parse out which statements of fact, vague as they may be, are the result of his own personal knowledge as opposed to the personal knowledge of the other individuals. Furthermore, the amended complaint itself is not verified such that the Court could consider factual statements made in it by the other individuals who are no longer Plaintiffs in this suit. In any event, given the limited length of both the amended complaint and the response, the Court will consider facts contained therein that can be reasonably based on Bentz's own personal knowledge.

## FACTUAL BACKGROUND

On May 12, 2014, Kimberly Butler, the Warden of Menard, issued a "Procedural Bulletin" setting forth how to combat excessive summer temperatures and how to recognize and report heat related health conditions (Doc. 114-3, pp. 1-2). The Bulletin was issued to all staff and offenders and provided, in particular, that: (1) on "extremely hot days," fans should be provided and placed around the cells and galleries to achieve a gentle breeze; (2) when temperatures reach 95°F, inmates should be permitted to shower frequently to reduce body temperature, ice water should be made available "at all times during the working hours," temperatures in the cells should be monitored, and hard labor activities limited; and (3) frequent medical rounds should be made and signs of

heat exhaustion or heat stroke should be reported immediately to health personnel (*Id.*) (emphasis in original). The Bulletin also indicated that all inmates would be permitted to purchase fans (even if restricted in their commissary purchases) during the summer months and that ice would be handed out beginning on June 1, 2014 (*Id.*). This Bulletin was reissued in 2015 and 2016 (Doc. 114-2, p. 2).

On May 29, 2014, shortly after Butler originally issued her Bulletin, the Medical Director for the Illinois Department of Corrections, Dr. Louis Shicker, issued a memorandum to upper-level administrators (*i.e.*, Wardens and Directors) on the prevention of heat-related illnesses (Doc. 114-4). The memo sets forth certain procedures that should be followed and measures that should be instituted depending on the heat index.[2] For instance, when the heat index reaches 90°F, water must be made available,

---

[2] According to the National Weather Service, "the heat index is a measure of how hot it really feels when relative humidity is factored in with the actual air temperature." http://www.nws.noaa.gov/om/heat/heat_index.shtml (last visited May 8, 2017). *See also* (Doc. 114-4, p. 4). A chart presented by Defendants indicates that a heat index of 80°F to 90°F requires caution because fatigue is possible with prolonged sun exposure or physical activity (Doc. 114-4, p. 4). A heat index between 90°F to 105°F (or 103°F according to the National Weather Service) requires extreme caution because heat stroke, muscle cramps, and heat exhaustion are possible with prolonged sun exposure or physical activity (Doc. 114-4, p. 4). A heat index between 105°F to 129°F (or 103°F to 124°F according to the National Weather Service) indicates danger because muscle cramps and heat exhaustion are likely, and heat stroke is possible, with prolonged sun exposure or physical activity (Doc. 114-4, p. 4). And 130°F and above (or 126°F according to the National Weather Service) indicates extreme danger because heat stroke is likely (Doc. 114-4, p. 4).

Heat cramps are the first stage of heat-related illness and involve painful muscle cramps and spasms, usually in the legs or abdomen, very heavy sweating, fatigue, and thirst. Heat exhaustion is the next stage of heat-related illness; people with heat exhaustion may experience headache; weakness; lethargy; dizziness or fainting; nausea or vomiting; pale, clammy skin; and a rapid, weak pulse. Heat stroke is the most serious heat-related illness. Heat stroke occurs when the body is no longer able to regulate its temperature, and it keeps rising. Symptoms of heatstroke include, fever; dry, hot, red, skin; rapid, shallow breathing; rapid, strong pulse; irrational behavior; extreme confusion; seizures; and unconsciousness. Heat stroke is a severe medical emergency, and a delay in treatment could lead to shock, brain damage, organ failure, and even death. (All information regarding heat-related illnesses was obtained from the websites of the National Weather Service, the National Institute of Health, and the Center for Disease Control and Prevention, *available at* http://www.nws.noaa.gov/om/heat/heat-illness.shtml (last visited

and hard labor should be curtailed (Doc. 114-4). When the heat index reaches 95°F, hard labor must be stopped, and frequent showers should be permitted (*Id.*). And when the heat index reaches 100°F, all non-essential labor must be stopped, and ice and water should be made available in housing units (*Id.*).

With respect to monitoring temperatures, Bill Westfall, a Correctional Sergeant assigned to the N-2 cell house between April 2014 and May 2015, indicated that a Unit Shift Report was completed during each shift memorializing the temperature of the cell house, measured by thermometers located on one of the four galleries, and the time it was recorded (Doc. 114-5, pp. 1-2).

Notably, while Defendants presented that policies were in place at Menard to address high heat and high heat indexes—specifically, the Procedural Bulletin and the Director's Memorandum—they did not present any evidence that those policies were actually followed during the relevant time period by any of the named Defendants. Nor is there any evidence that Unit Shift Reports were actually generated for each of the three shifts during the relevant time period. Finally, Defendants have presented no evidence of the actual temperature or heat index within the cells, galleries, or the N-2 cellblock itself. The pieces of evidence that Defendants have presented, therefore, are only tangentially relevant to Bentz's claim that none of the Defendants actually did anything to combat excessive heat in the cells where he was housed. Thus the actual conditions of Bentz's confinement can only be gleaned from his deposition and the

---

May 8, 2017); https://medlineplus.gov/ency/article/000056.htm (last visited May 8, 2017); https://www.cdc.gov/extremeheat/warning.html (last visited May 8, 2017)).

statements of fact made in his response and the amended complaint.[3]

Bentz testified that he was housed in the N-2 cellhouse in general population in an open-bar cell in 2014 (Doc. 114-1, pp. 3, 4). He further testified that he knew the temperature or heat index was over 100 degrees because he watched the Weather Channel and local weather channel for Chester, Illinois (the town next to where Menard is located) (*Id*. at pp. 4, 5). No ice or ice water was passed out during the 7:00 a.m. to 3:00 p.m. shift, however, regardless of temperature (*Id*. at pp. 3, 4). At the time, Bentz heard guards tell other inmates that no ice/ice water would be passed out because it was not "over a hundred degrees,"[4] but he claims that no ice was passed out even when it did reach that temperature (*Id*. at pp. 3-4*)*. Bentz had a personal fan throughout the relevant time period, but "when it gets that hot, the fan doesn't cut it," and there were no other fans located in the gallery where he was housed (*Id*. at p. 4). He testified that three oscillating fans were not installed in the gallery until 2015 (*Id*. at p. 5). And while there were windows in each cell on the gallery, not all of them were operational; according to Bentz, for "every 10 or 15, maybe 20 cells you only got four little windows that open" (*Id*. at p.4).

There is no indication of where Bentz was housed during the summer of 2015 (*see* Doc. 114-1). It is also not completely clear where Bentz was housed during the

---

[3] The amended complaint, filed on November 6, 2014, can only provide evidence as to the conditions in the summer of 2014. Plaintiff's deposition occurred on October 18, 2016 (Doc. 114-1, p. 1), and his amended response was filed on April 7, 2017 (Doc. 131). The amended complaint and Bentz's response provide facts that are generally consistent with his deposition.

[4] The guards' statements appear consistent with Dr. Shicker's memo.

summer of 2016, but it appears that he spent time in both the South Uppers and a segregation cell in the North cell house (*see id.* at pp. 5, 7, 10–11). His segregation cell had a solid core door, but the door had a chuckhole that he was allowed to leave open for ventilation (*Id.*) He also had his fan while he was in segregation (*Id.* at p. 6). In the South Uppers, there were no fans along the gallery, although there was a large, six-foot fan at the entrance of the gallery (*Id*). Bentz states, however, that during the *winter* months on that gallery, it was hotter than the summer months "when it was a hundred degrees" because the heater would be on (*Id.*). At one point in his deposition, Bentz indicated that the heat was stifling, caused nose bleeds, and reached temperatures of 120°F (*Id.* at p. 17).

Bentz also claims that some of the cells he was housed in did not have cold water, but he did not specify which cells (Doc. 114-1, p. 5). He explained that he does not have a good recollection of when he was without cold water because the lack of cold water, or the lack of water period, and general plumbing issues occurred so frequently at Menard (*Id.* at pp. 5-6). With respect to showers, Bentz testified that he was allowed two showers per week in 2014 and three showers per week beginning in 2016 (*Id.* at p. 6). He testified that only two medical rounds were made during the summer of 2014:   in the morning and the evening to pass out medication (*Id.* at p. 8). No additional rounds were made (*Id.*).

Essentially, Bentz's main gripes are that ice or ice water was not passed out during the hottest time of the day but rather in the evening when its effectiveness was mitigated by falling temperatures; that medical personnel did not make extra rounds during hot days to ensure inmates' well-being; that there were no fans for ventilation;

that there was no air movement, especially in cells with solid doors; and that there was no way to open windows in all cells (Doc. 114-1, pp. 16-17).

Bentz believes that when the heat is 80°F or hotter, old injuries that he has to his neck and hand get inflamed and swell (Doc. 114-1, pp. 7, 9). The inflammation in his neck (which he claims is also affected by stress and dental issues) causes pressure behind his eyes and vision problems (*Id.* at p. 9). With respect to the inflammation in his hand, Bentz testified that it became difficult to write, and he was in "chronic pain" (*Id.*). Bentz testified that he also suffered from muscle cramps and faintness in 2014 (*Id.*). In 2016, he suffered from dehydration, muscle cramps, faintness, weight loss, and chest pains because of the heat (at the time, he was in segregation behind a solid door) (*Id.* at p. 7-8).

Bentz claims that he complained about the excessive heat to Defendant Aimee Lang in 2014 whenever he would see her (Doc. 114-1, 8). He also went to the Healthcare Unit and complained about his neck and hand issues that were related to the excessive heat (*Id.*).[5] When asked about the other Defendants, Bentz almost uniformly indicated that they worked in or around the N-2 cellblock, that he mentioned the conditions of his confinement (*i.e.*, the lack of ice/ice water and ventilation/fans) to them in passing, and that they did nothing (*See generally Id.* at pp. 10-17). It is not clear during which year(s) Bentz encountered each individual Defendant.

Bentz admitted at his deposition that the actions of Defendants Kimberly Butler,

---

[5] Bentz appears to agree that he only saw a nurse (presumably Lang) on May 11, 2014, when he injured his neck and then saw a doctor the following year in August 2015 for that injury (Doc. 114-1, p. 9). The implication is that he was not seen by healthcare in between. Bentz next testified that he sent in sick call requests but that they went unanswered (*Id.*).

Frank Eovaldi, James Best, Clint Mayer, Shane Quandt, Nicholas Bebout, Aimee Lang, and Jay McMillan's—denying him measures to provide relief from the heat—were not taken in order to retaliate against him for filing grievances or lawsuits (Doc. 114-1, pp. 10, 12, 13, 15, 16).

As for Defendant Michael Samuels, when Bentz was asked if Samuels retaliated against him, Bentz replied, "I, I don't know off the top of my head. I don't recall. I've had issues with him on other cases . . . he's been sued by me . . . . So he kind of, I don't know if he's like retaliating or just ignoring me because I'm suing him" (Doc. 114-1, p. 11). Later when asked if he had any specific evidence that Samuels retaliated against him, Bentz said, "As far as, I don't recall off the top of my head. If I did, I would have put it in my, in my lawsuit. Unless it's something that happened afterwards I would have probably wrote him up for it" (*Id.* at p. 12).

Bentz testified that Defendant Donald Lindenberg retaliated against him by harassing and threatening him on a daily basis for years (Doc. 114-1, p. 14). Bentz admitted, however, that he did not think that Lindenberg's actions were in response to his complaints about the excessive heat or that Lindenberg somehow subjected him to the excessive heat (*e.g.,* transferred him to a particularly hot cell house or refused to give him ice) (*Id.*). Bentz further testified that he is suing Lindenberg for his pattern of harassment in another lawsuit, *Bentz v. Lindenberg*, SDIL Case No. 15-121-NJR-DGW (*Id.*).

With respect to Defendant Joshua Berner, Bentz testified that Berner routinely retaliated against him in various ways, such as taking his clothing, taking his property,

and antagonizing him (Doc. 114-1, p. 15). When asked how Berner retaliated against him as it pertains to this lawsuit and the excessive heat, Bentz stated, "he, I guess you would say denied me adequate combative measures" (*Id.*).

As for Defendant Jared Phillips, Bentz testified that anytime he asked Phillips for something in relation to the excessive heat, Philips responded by harass[ing Bentz] for filing lawsuits and stuff like that" (Doc. 114-1, p. 13). When asked to describe the harassment, Bentz stated "I mean like every time I pass him . . . I'm being, you know, referred to as a suer. . . . It's mainly just, you know, harassment, no threats. It's just, you know, constant nagging and grief, I guess you would say" (*Id.*).

Finally, with respect to Defendant Bill Westfall, Bentz testified that, at the time he filed this lawsuit in September 2014, Westfall had done nothing to retaliate against him (Doc. 114-1, pp. 10–11). But Bentz went on to say that Westfall retaliated against him after this suit was filed (*Id.*). Specifically, in June 2016, Bentz filed an emergency grievance about the excessive heat in the South Uppers cell house (*Id.*; *see also* Doc. 92, p. 14). Several days later, Bentz was moved out of the South Uppers to the North Uppers, and Westfall told him it was because he complained about the excessive heat (Doc. 114-1, p. 10).[6]

## DISCUSSION

### A.  Count 1—Conditions of Confinement

As indicated above, Bentz claims that the conditions of his confinement became

---

[6] The grievance Bentz filed after his transfer indicates that "Major Bill Westfall told me that I should not have filed a grievance about the excessive heat and I would not have been moved. 'Good luck in <NU> North Uppers there is no ventilation, you might die over there, you should not sue for things like excessive heat'" (Doc. 92, p. 14).

unconstitutional during the summertime months because he was required to endure heat indexes of 90°F and above with no adequate relief. Bentz further claims that he informed Defendants, almost all of whom worked the 7:00 a.m. to 3:00 p.m. shift in the N-2 cellhouse, that the conditions were intolerable, but they did nothing to alleviate the heat.

"[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society," and so, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (internal quotations omitted). Indeed, "the Constitution . . . does not mandate comfortable prisons." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). While "[i]nmates cannot expect the amenities, conveniences and services of a good hotel . . . the society they once abused is obliged to provide constitutionally adequate confinement." *Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir. 1988). Thus, prison officials violate the Eighth Amendment when "they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show: (1) a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities, and (2) prison officials were deliberately indifferent to this state of affairs. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quotation marks and citation omitted).

As to the first objective element, courts have found that extreme temperatures inside prisons can violate the Eighth Amendment. *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[I]t is well settled that exposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."); *White v. Monohan*, 326 F. App'x 385, 387 (7th Cir. 2009) (holding prisoner sufficiently stated conditions of confinement claim based on extreme cell temperatures over 100 degrees and the lack of ventilation); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment." (citing *Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004)). In determining whether the heat is unconstitutionally excessive, the Court must look at both the severity of the heat and its duration. *Chandler*, 379 F.3d at 1295; *Cf. Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) ("[I]t is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional.").

Here, as previously mentioned, Defendants did not put forth any evidence regarding the summertime temperatures or relative humidity outside or inside Menard. But Rule 56 does not require Defendants to provide any evidence to negate Bentz's claim. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citation omitted). Defendants can instead discharge their burden under Rule 56 by pointing out that there is an absence of evidence to support Bentz's claim, which is precisely the case here. *Id.*

While the Court has no doubt that the summertime temperatures inside Menard are uncomfortable, there is simply no evidence sufficient for a jury to find that the heat was serious enough to deny the "minimal civilized measure of life's necessities." The only evidence regarding the temperature is Bentz's repeated statements throughout his deposition that the heat at Menard during the summertime was "excessive" (Doc. 114-1). At one point, he also testified that during the summer of 2014 he knew that the temperature or heat index was over 100 degrees because he watched the Weather Channel and local weather channel for Chester, Illinois, which is the town next to Menard (Doc. 114-1, pp. 4, 5). Unfortunately, however, this assertion is not supported by any data, and the Court's own internet research indicates that the average maximum temperature during the summer of 2014 was between 81 and 84 degrees, and the temperature never reached 100 degrees.[7] In fact, according to the National Oceanic and Atmospheric Administration, the summer of 2014 was one of the ten coolest summers on record in Illinois.[8] Based on this extremely limited evidence, there is no way to determine the number of days where the indoor or outdoor temperatures or heat index

---

[7] This information comes from the Weather Underground's website. The Court typed "Menard, Illinois" into the search bar, clicked on the "history" tab, and then input the desired date into the designated boxes. https://www.wunderground.com. That search provided historical data for Sparta, Illinois, which is a town located approximately 19 miles north of Menard, according to Google Maps. Another website, www.usclimatedata.com, provided similar information for Carbondale, Illinois, which is a town approximately 40 miles southeast of Menard.

[8] Chris Geelhart, NAT'L OCEANIC AND ATMOSPHERIC ADMIN., *2014 Year in Review for Central and Southeast Illinois,* available at http://www.weather.gov/media/ilx/Climate/2014%20Annual%20Summary.pdf (last visited May 10, 2017).

exceeded 90 degrees (or 95 degrees or 100 degrees) or whether any of those occasions were on consecutive days.[9]

Additionally, Bentz has not pointed to any evidence that he was susceptible to health complications because of excessive heat or that he suffered harm from the heat. He testified that he experienced some swelling, cramping, and faintness, which are issues common for anyone who spends any length of time in the summer heat. *Cf. Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (holding that inmate failed to show that "he suffered from anything more than the usual discomforts of winter" when he stated that as a result of cold temperatures in his cell "he suffered from hurt ears and numb hands, felt frostbite, and caught colds"). *But see Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (finding temperatures in excess of 85°F greatly increase the risk of heat-related illness for pretrial detainees taking psychotropic medications because those medications affect the body's ability to regulate heat); *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004) (noting that mental illness and medications that interfere with the body's ability to maintain a normal temperature can make inmates more susceptible to heat-related illness).

Once again, the Court has no doubt that it is unpleasant to be inside a cell at Menard during the summertime. However, because there is no evidence reflecting the intensity and duration of the heat and no evidence demonstrating that Bentz faced anything other than the usual discomforts to be expected during the summer in a

---

[9] The Court could have obtained this data from the Weather Underground for Sparta, Illinois, but it would have taken an extensive amount of searching, clicking, compilation, and analysis (beyond what was already done by the Court). And it is not the Court's job to locate or create evidence the parties chose not to obtain and/or submit.

building in Southern Illinois that is not air-conditioned, no reasonable jury could find that the heat was unconstitutionally excessive. *Green v. Walker*, 398 F. App'x 166, 168–69 (7th Cir. 2010) (affirming grant of summary judgment on conditions of confinement claim because the plaintiff did not point to "any evidence reflecting that the heat carried on at extreme levels for an extended duration or that he suffered any harm from the heat," and therefore he could not show the heat was unconstitutionally excessive); *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (affirming grant of summary judgment on conditions of confinement claim because the plaintiff "presented no evidence regarding the duration of the alleged excessive heat and no evidence that his medical problems resulted from the conditions of his confinement"). *See generally, Chandler v. Crosby*, 379 F.3d 1278, 1297 (11th Cir. 2004) (discussing case law in which federal courts have considered Eighth Amendment claims regarding heat and ventilation).

Because Bentz cannot satisfy the objective component of his conditions of confinement claim, the Court need not consider the subjective component of whether Defendants were deliberately indifferent, either individually or in conspiracy with one another. Defendants are entitled to summary judgment on Count 1, which eliminates the need to address the issue of qualified immunity.

## B. Count 3 — Retaliation

In Count 3, Bentz claims that Defendants refused to provide him with ways to beat the heat in the cell house in order to retaliate against him filing lawsuits and grievances.

It is well-settled that a prison official who takes action in retaliation for a prisoner's exercise of a constitutional right violates the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). At the summary judgment stage, a prisoner has the initial burden to make out a *prima facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012)).

Here, Bentz indisputably filed grievances and lawsuits, which are activities protected by the First Amendment. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). Bentz cannot, however, satisfy the other two elements of a *prima facie* case for any of the Defendants.

With respect to Defendants Butler, Eovaldi, Best, Mayer, Quandt, Bebout, Lang, and McMillan, Bentz admitted that none of their actions were taken in retaliation for filing grievances or lawsuits (Doc. 114-1, pp. 10, 12, 13, 15, 16).

With respect to Defendant Samuels, Bentz could not recall whether or how Samuels retaliated against him (Doc. 114-1, pp. 11, 12), and Bentz submitted no other evidence regarding retaliation by Samuels (*see* Doc. 131).

As for Defendant Lindenberg, Bentz indicated that none of Lindenberg's purported retaliatory actions were related to the excessive heat (Doc. 114-1, p. 14), and therefore Lindenberg's actions do not fall within the scope of Count 3.

As for Defendant Berner, the only evidence of retaliation is Bentz's vague and conclusory statement that Berner denied him "adequate combative measures" (Doc. 114-1, p. 15). Bentz provided no further evidence or details regarding his purported requests to Berner or Berner's response (*see id.*). This "scintilla of evidence" is insufficient to defeat summary judgment because no reasonable jury could find in his favor based on this evidence alone. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). *See also Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion."); *Dale v. Lappin,* 376 F.3d 652, 655–56 (7th Cir. 2004) (plaintiff who offered concrete details in a sworn statement submitted enough to defeat summary judgment, whereas vague assertions are not sufficient to create a genuine issue of fact).

Similarly, with respect to Defendant Phillips, Bentz provided only a vague description of Phillips's purported verbal harassment (Doc. 114-1, p. 13), which is insufficient to establish that the harassment was serious enough to deter a person of "ordinary firmness" from filing lawsuits in the future. *See Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016) ("*DeWalt v. Carter* [224 F.3d at 612], suggests that 'simple verbal harassment' of a prisoner does not suffice" to establish a *prima facie* case of retaliation).

Finally, with respect to Defendant Westfall, Bentz testified that he was moved from the South Uppers to the North Uppers, and Westfall told him it was because he filed a grievance about the excessive heat (Doc. 114-1, p. 10). First, the Court does not understand how this transfer could possibly be construed as a deprivation related to the

excessive heat when Bentz testified that "every cell house tends to have all the same problems as related to heat as North 2" (Doc. 114-1, p. 10). In other words, according to Bentz, the heat in the North Uppers isn't any worse than the heat in the South Uppers. Second, even if the move could be construed as a deprivation related to the excessive heat, there is nothing that indicates Westfall was responsible for that deprivation. For instance, there is no evidence that Westfall was responsible for cell assignments, that he had the authority to transfer inmates to another cell, or that he requested or took steps to initiate Bentz's transfer. Without some evidence to that effect, Westfall's comment cannot be viewed as anything more than him communicating to Bentz the reality of his situation, which does not amount to retaliation.

For these reasons, Defendants are entitled to summary judgment on Count 3. This conclusion, once again, means that the Court need not consider the issue of qualified immunity.

## C. Count 2—State Law Negligence

Because Defendants are entitled to judgment as a matter of law as to the federal claims, the Court declines to exercise jurisdiction over Bentz's related state law tort claims. *See* 28 U.S.C. § 1367(c)(3); *Contreras v. Suncast Corp.,* 237 F.3d 756, 766 (7th Cir. 2001) ("A decision to relinquish pendent jurisdiction before the federal claims have been tried is, as we have said, the norm, not the exception, and such a decision will be reversed only in extraordinary circumstances.") Consequently, the portion of Defendants' motion for summary judgment related to Count 2 is denied as moot.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment filed by Defendants, except C/O Spiller, on January 11, 2017 (Doc. 113) is **GRANTED in part and DENIED in part as moot**.

Summary Judgment is **GRANTED** on Counts 1 and 3 against Bentz and in favor of Defendants**.** Summary Judgment is **DENIED as moot** as to Count 2 against these Defendants. Count 2 is **DISMISSED without prejudice**.

Furthermore, to the extent that Counts 1 and 2 state a claim on behalf of unnamed class members, those claims are **DISMISSED**.

This matter remains pending on Counts 1, 2, and 3 against Defendant Westley Spiller *only*. Pursuant to Federal Rule or Civil Procedure 56(f), the parties are informed that the Court is inclined to grant judgment on Counts 1 and 3 and to dismiss Count 2 as to Defendant Spiller for the same reasons as set forth above. The parties shall file briefs, not to exceed five pages, as to why such a ruling should or should not be made as to Defendant Spiller on or before June 15, 2017.

**IT IS SO ORDERED.**

**DATED:   May 15, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**